## IN THE FEDERAL DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **R. FANNING** | ) | |
| 2306 NE 109th Terrace | ) | |
| Kansas City, MO 64155 | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.** |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **DST SYSTEMS, INC.** | ) | |
| 333 W. 11th St., Floor 1 | ) | |
| Kansas City, MO 64105 | ) | |
| | ) | |
| **Serve: CSC- Lawyers Incorporating** | ) | |
| **Service Company** | ) | |
| 221 Bolivar Street | ) | |
| Jefferson City, MO 65101 | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT FOR DAMAGES

**I. Preliminary Statement**

1.       COMES NOW, Plaintiff, R. Fanning, by and through his attorneys of record, Kevin Baldwin, Eric Vernon, and Sylvia Hernandez of Baldwin & Vernon, and brings this cause of action against Defendant DST Systems, Inc. This action seeks declaratory, injunctive and equitable relief, actual, compensatory and punitive damages, and costs and attorneys' fees in accordance with R.S.M.o §213 *et. seq.*, ("MHRA") and actions taken against Fanning in violation of the American's with Disabilities Act of 1990, 42 U.S.C. § 12021 *et seq.*, as amended, ("ADA") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, as amended ("ADEA").

## II. Jurisdiction & Venue

2.      Fanning is alleging claims of disability and age discrimination and retaliation under the MHRA). This Court has jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

3.      Fanning is alleging claims of disability and age discrimination and retaliation under the ADA and the ADEA.  This Court has jurisdiction of these claims pursuant to 28 U.S.C. § 1331.

4.      Fanning has met the jurisdictional prerequisites to this action by exhausting his administrative remedies as set forth the MHRA, the ADA and the ADEA. 42 U.S.C. 12188, 42 U.S.C. 2000a-3(a), and 42 U.S.C. 2000a-6(a); 28 U.S.C. 1331, 42 USC 2000e- 5 (f); and 213.010 et seq. R.S.MO.  Fanning timely filed his charge of discrimination with the Missouri Commission on Human Rights ("MCHR") and the Equal Employment Opportunity Commission ("EEOC").  The MCHR issued a right-to-sue letter on December 18, 2018 and the EEOC issued a right-to-sue letter on December 20, 2018.  Fanning has filed suit within 90 (ninety) days of receiving her notices of rights.  Fanning's right-to-sue letters and charge of discrimination, are attached hereto as Exhibit 1 and are incorporated by reference as if fully set forth herein.

5.      Venue is proper in this court for as the causes of action complained of accrued in Jackson County Missouri.

6.      Fanning, based upon reasonable belief at this time absent discovery, indicates that the amount of compensatory and/or special damages in controversy is in excess of $25,000.00; in addition, Fanning seeks declaratory, injunctive and equitable relief, as well as punitive damages, pursuant to §213.010 *et seq*. R.S.MO.  Costs and attorneys' fees may be awarded pursuant to §213.010 *et seq*. R.S.MO. and are requested by Fanning.

7. Declaratory, injunctive, and equitable relief is sought pursuant to 28 USC § 2201, 2202, 42 USC § 1981a; and 213.010 et seq. R.S.MO.

8. The ADAAA prohibits employers from "discriminat[ing] against a qualified individual with a disability," 42 U.S.C. § 12112(a), and requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability," *id* §12112(b)(5)(A).

9. The ADEA prohibits age discrimination in employment for those who are 40 years of age or more. 29 U.S.C. §621.

10. Costs and attorneys' fees may be awarded pursuant to 42 USC § 2000e-5(k); 213.010 et seq., R.S.Mo., and Fed. R. Civ. P. 54.

11. This action properly lies in the Western District of Missouri, pursuant to 29 USC § 1391(b), because the claim arose in this judicial district, and pursuant to 42 USC § 2000e-5(f)(3) because the unlawful employment practices were committed in this judicial district.

## IV. Parties

12. Plaintiff is a resident of the United States residing at 2306 NE 109th Terrace, Kansas City, Missouri 64155.

13. DST is an employer engaged in an industry affecting commerce, and, upon information and belief, employs more than 20 regular employees. The DST is a corporation, (containing within its charter the requisite authority to sue and be sued), and does business in this judicial district, at various locations within Jackson County, Missouri, at all relevant times referred to herein, specifically at 333 W. 11th St., Floor 1, Kansas City, MO 64105. DST is an employer within the meaning of §213.010, *et seq*., R.S.MO. DST is subject to the MHRA's prohibition on employment discrimination and retaliation for its employees.

**V. Facts Common to All Counts**

14. Plaintiff, R. Fanning, is a 51-year-old male who worked for DST from August 9, 1993, until he was constructively discharged from his employment on November 30, 2017.

16.     When Fanning began working for DST, he was apprehensive about the job because DST only offered to pay him $16,000 a year.  However, Fanning felt it would be a good opportunity to get into corporate America straight out of college.

17.     The job Fanning accepted was as a Quality Control Operation Specialist.  In that position Fanning was responsible for supervising transactions and ensuring that the transactions that came through DST's mutual fund system were processed and were accurate.

18.     Later Fanning's manager left the company and Fanning began reporting to Ken Stewally, manager of the QC Quality Assurance Department.

19.     After working for Ken for two years, DST promoted Plaintiff twice and offered him the opportunity to enroll in the "Series 6 Class" offered by Defendant.

20.     Fanning passed the Series 6 class with a score of 88 percent.

21.     During Fanning's time working for Ken Stewally, Plaintiff not only did his duties as a Quality Insurance Provider, but also offered to help outside of normal business hours to process and assist on issues and answer the phones for the Berger Funds.

22.     After two years in that position, Fanning realized that he was not meeting his goal of becoming a mutual fund agent, which was his aspiration when he graduated from college.

23.     After reviewing other job opportunities at DST, Fanning moved to a position in Software Management Control ("SCM"). There, Plaintiff learned a lot about how DST's software was developed for its clients and how it was distributed.

4

24.     After a year in that job, DST offered Fanning a job working in AWD Support for Roy Lambright. Fanning accepted the job because he felt that it was a step up in his career.

25.     After seven years, DST offered Fanning the opportunity to apply for AWD Level 2 Support. Fanning took that position because he felt it would be an advancement in his career.

26.     Fanning excelled in his position as AWD Level 2 Support and DST promoted him to be the lead of that team, a position he worked in for approximately 8 years.

27.     Things went well for Fanning working as an AWD Level 2 Support until his father was diagnosed with stage four lung cancer.

28.     After Fanning's father died, Plaintiff became very depressed and started to suffer anxiety attacks. Fanning sought medical treatment for these issues and was prescribed Zoloft and Xanax.

29.     Although Fanning was under medical treatment and taking medication, this did not affect his job performance.

30.     Soon after Fanning's father's death, DST hired new upper management.

31.     The new management decided that there was no reason to have two levels of support for the AWD product.

32.     DST then offered Fanning a supervisor role back in AWD Level 1 Support. However, due to his concerns about the uncertainty of the department direction, Fanning chose not to accept this position.

33.     DST then promoted Plaintiff to Internal Coordinator for its International Support Teams, which included offices in the United Kingdom, Australia, and Thailand.

34.     Then DST had another management change and reorganization.

35.     At that point, DST gave Fanning a temporary assignment to work in the Quality Control Department due to his vast knowledge of the AWD product.

36.     DST told Fanning that this new assignment was to be a temporary position, but Plaintiff liked what he was doing and really felt he was making a better impact for the company by discovering defects in the products before they went out to DST clients.

37.     Therefore, Fanning approached his manager, Brigid Triggs, and told her he thought that job would be a better fit for him and wanted to see if it could be a permanent position.  Ms. Triggs approved this request.

38.     In June 2012, Steve Hooley replaced Tom McDonald after he retired from DST.

39.     During that time, DST laid off about 10 percent of its employees.

40.     Also, during that time, Ms. Triggs moved to a different area within DST and was replaced by Swarupa Basil.

41.     Fanning then approached Swarupa and explained that he wanted to earn his quality control certification.

42.     Swarupa granted Fannning that opportunity and, after studying very hard, DST sent Plaintiff to Chicago to attend the class that was offered by SQE.

43.     Fanning completed the class and earned his Certified Software Tester (CSTF) certification.

44.     Then, Tracey Pratt replaced Swarupa after she left the department. Fanning worked for her for two years.

45.     After Pratt left DST, Neil Baker was put in charge as the interim manager for about six months.

46.     Then, Praveen Kode replaced Baker as the permanent manager.

6

47. Around that time, DST moved Fanning into a Quality Assurance Advisor position with the Dev Ops Development Team. The responsibility of that team was to fix bugs in AWD as well as bugs in other AWD products.

48. Fanning's role was to work with the developers on this team and to come up with testing plans for the issues that they were fixing. Tim McMullin was the manager of the team.

49. After Steve Hooley took over, he started to replace upper management with his own people.

50. Along with that change, in November 2016, Hooley hired Tim Mendenhall to be in control of all of DST's Quality Control departments.

51. Mendenhall mentioned early on in his town meetings that his goal was to automate all QC testing.

52. On September 11, 2017, Kode called Fanning and told Fanning that he would still be the Quality Assurance Advisor for the Dev Ops team, but that Fanning would no longer be reporting to her. Instead, Fanning would be reporting to Kim Mitchell in the QA Support Department in another building as a Quality Assurance Consultant.

53. Although Fanning's new job expectations were not defined, Kode instructed Fanning to teach the new team about AWD because they had no experience with the product.

54. In October 2017, Fanning had his first one-on-one meeting with Mitchell. During the meeting, Fanning mentioned he had a disease called Barrett's esophagus disease, which from time to time would require him to work from home, because he needed to be near a restroom.

55. At first, Mitchell said it would not be an issue, as DST had a policy that every employee was allowed to work from home thirty days a year.

56.     Mitchell then explained to Fanning that she had not really created a job profile for him yet and that he should just continue doing what he was doing for the Dev Ops team as their QA Advisor.

57.     After another few weeks, Fanning asked to have a one-on-one meeting with Mitchell again because he still did not have a job profile, but Mitchell said she was still working on it.

58.     On November 9, 2017, at 2:00PM, Mendenhall called an all hands-on deck meeting for his QC report in Room BW306a.

59.     In that meeting, Mendenhall informed all of the staff that he was changing all of the job profiles from non-technical to technical.

60.     Mendenhall said that everyone needed to learn the programming language of Java to achieve automated testing, which is what the new job profiles were going to require.

61.     Mendenhall also stated that DST was not going to provide any training to learn those skills and that the staff would have to learn them on their own time and cost.

62.     Mendenhall then commented that anyone not able to learn these skills by 2018 would be replaced with young college graduates.

63.     At this point, it was clear that DST was setting its older employees to fail by not giving them the training they needed to perform the job, thereby facilitating their departure from DST.

64.     It was at that time that Fanning realized that the culture of DST had become very toxic, even though he had known it had been headed that way for a few years.

65.     After the meeting, the staff had another testing cycle coming up and Kode sent Fanning an email asking if the environment was set-up for testing.

8

66. Fanning responded to all that he was not sure and would have to check with Warren Bowers, who was responsible for setting up those environments.

67. Apparently, Fanning's response did not go over well with his manager Mitchell, as she came over to his desk and yelled at him in front of all of his co-workers on the open-floor environment.

68. Mitchell told Fanning that it appeared that he did not know what he was doing and the fact that Plaintiff responded to all in his email, which included Mendenhall, made her look really bad.

69. After being so embarrassed because Mitchell yelled at Fanning in front of all of his peers, Fanning's stomach became upset and his anxiety kicked in, thus he sent Kim an email saying he was not feeling well and was leaving for the day, but he would work the rest of his shift from home.

70. Because Fanning suffered from depression and anxiety related disorders, Mitchell yelling at him exacerbated his symptoms.

71. At home, Fanning talked to his wife and explained to her what happened. Fanning's wife suggested that he write an email to Mitchell.

72. Fanning then sent an email to Mitchell stating that she embarrassed him in front of his co-workers when she yelled at him at his desk instead of taking him into a conference room for a private conversation. Fanning also mentioned that she never provided him with a job profile clarifying what his job duties were supposed to be.

73. Also, in that same email, Fanning informed Mitchell that he had never been given the opportunity for service center desktop training, which is a product that is written in-house from DST and was a requirement in order to perform his job.

9

74. When Fanning sent this email to Mitchell, he also included their manager, Mendenhall, hoping he would see the way that Fanning was being treated, and the hostile environment to which he was being subjected.

75. However, Mendenhall never responded to Fanning's email or even asked to speak to him about any of the issues.

76. The following day, Mitchell pulled Fanning into a conference room stating that she should not have to use the conference room every time she needed to talk to him and that she did not think anyone heard her yelling at Plaintiff.

77. Mitchell also said that from now on if Fanning was away from his desk for an extended period of time (she did not say how long that time was), that he needed to send her an email telling her where he was and why he was not at his desk.

78. That was something only Fanning had to do. No other employee had to email Mitchell when he or she was away from his or her desk.

79. It was clear that Mitchell was retaliating against Fanning because he had complained.

80. Mitchell then mentioned that Fanning needed to have a weekly one-on-one meeting with her every week until he, "got it," which no other associate was required to do. Again, that was part of Mitchell's retaliation against Fanning.

81. The hostile work environment affected Fanning's health, as his depression and anxiety symptoms were exacerbated by the working conditions. As such, Fanning could not take it anymore.

82. Fanning had complained, but no one was helping. Management seemed to be against him instead of helping him.

83.    Since the environment had become very toxic and hostile Fanning had no other option but to submit his resignation to DST.

84.    On or about November 17, 2017, having no other option but to resign due to the discrimination, retaliation, and hostile work environment, Fanning gave his two-week notice stating his last day would be Friday, December 1, 2017.

85.    Fanning did not hear directly from either Mitchell or Mendenhall.

86.    However, that same day, Fanning received a group email from Mitchell sent to his direct departments stating, "Rob has informed me that he will be leaving DST and his last day will be November 30, 2017."

87.    On or about November 30, 2017, DST constructively discharged Fanning.

88.    After DST constructively discharged Fanning, Fanning filed for unemployment.

89.    On February 15, 2018, the Division of Employment Security granted Fanning's unemployment and made a finding that Fanning's resignation was due to medical reasons were attributable to the work; thus, Fanning's resignation was found to be for good cause attributable to the work or the employer.

90.    It is Fanning's contention that DST's actions were undertaken based upon Fanning's age, disability/perceived disability and in retaliation.

91.    Accordingly, Fanning is seeking any and all damages allowable under the MHRA, his attorney fees and a determination to ensure that they will stop this kind of discrimination and retaliation in the future.

92.    Fanning has experienced, is now experiencing, and will continue to experience into the indefinite future, garden variety emotional pain, suffering, inconvenience, mental

anguish, loss of enjoyment of life, and other non-pecuniary losses as a direct result of DST's conduct.

93.    Fanning has suffered and will continue to suffer future pecuniary losses as a direct result of DST's conduct.

94.    DST and its managers and other employees actively engaged in discrimination against Fanning with malice or in reckless indifference to his right to be free from such discrimination under the MHRA.

**VI. Causes of Action**

<u>**COUNT I**</u>

<u>**AGE  DISCRIMINATION**</u>
<u>**AGAINST DEFENDANT DST SYSTEMS, INC.**</u>

95.    Fanning hereby incorporates and re-alleges all previously alleged Paragraphs as if fully set forth herein.

96.    Fanning is an individual subject to the protection of the MHRA based upon the fact that he was over 40 years old at the time of the events alleged herein.

97.    DST's actions, as noted above, constituted discrimination against Fanning in violation of the MHRA.

98.    DST terminated Fanning's employment and Fanning's age was a motivating factor in the decision to constructively terminate his employment.

99.    At the time these actions were taken by DST, DST knew these actions were unlawful and that they were done with an evil motive and/or reckless indifference to the rights of Fanning to be free from such discrimination.

100.    DST's actions were unlawful employment practices in violation of the MHRA.

101.    Fanning has been damaged by DST's unlawful employment actions.

**COUNT II**

**DISCRIMINATION BASED UPON DISABILITY/PERCEIVED/REGARDED AS DISABELED BY DEFENDANT DST SYSTEMS, INC.**

102.　Fanning hereby incorporates and re-alleges all previously alleged Paragraphs as if fully set forth herein.

103.　At the time of the unlawful employment actions, Fanning was an individual with a disability and, as such, was a member of the protected group under §213 *et seq.*, R.S.MO.

104.　DST perceived Fanning as being disabled and that perception was a motivating factor in the decision to constructively terminate Fanning.

105.　At all times alleged herein, Fanning was an individual with a disability and was capable of performing the essential functions of his job with or without reasonable accommodations.

106.　At the time these actions were taken by DST, DST knew these actions were unlawful and that they were done with an evil motive and/or reckless indifference to the rights of Fanning to be free from such discrimination.

107.　DST's actions were unlawful employment practices in violation of the MHRA.

108.　Fanning has been damaged by DST's unlawful employment actions.

**COUNT III**

**RETALIATION
AGAINST DEFENDANT DST SYSTEMS, INC.**

109.　Fanning hereby incorporates and re-alleges all previously alleged Paragraphs as if fully set forth herein.

110.　Fanning hereby alleges claims of retaliation against DST.

111.　DST's actions, as noted above, constituted retaliation against Fanning in violation

13

of the MHRA.

112. Fanning's actions of complaining of what he believed to be acts in violation of the Missouri Human Rights Act as set forth herein was a motivating factor in DST's decision to retaliate against him by treating him differently, subjecting him to a hostile work environment, subjecting him to a heightened level of scrutiny, setting him up to fail, yelling at him, threatening him, not allowing him to leave his desk without reporting it to his supervisor, having weekly meetings with his supervisor to check his work when no one else had to do that, and/or constructively terminating him from his employment with DST.

113. At the time these actions were taken, DST knew that its actions were unlawful and its actions were undertaken maliciously and/or in reckless disregard for Fanning's right to be free from discrimination.

114. DST's actions were outrageous because of their evil motive or reckless indifference to the rights of the Fanning when it engaged in acts of retaliation against the Fanning that culminated in his termination.

115. Fanning has been damaged by DST's unlawful employment actions in violation of the MHRA.

<u>**COUNT IV**</u>

**<u>DISABILITY DISCRIMINATION UNDER
THE ADAAA FOR FAILURE TO ACCOMMODATE
AGAINST DEFENDANT DST SYSTEMS, INC.</u>**

117. Fanning hereby incorporates and re-alleges all previously alleged Paragraphs as if fully set forth herein.

118. Fanning has been diagnosed with depression and anxiety related disorders, and Barrett's esophagus disease, and is therefore considered a member of the protected category

under the Americans with Disabilities Act As Amended.

119.   Fanning was qualified and capable of performing the essential functions of the position and/or would have been if reasonable accommodations had been made for him.

120.   DST's actions, as noted above, were discriminatory, continuous, arbitrary and capricious and constituted a disparity in treatment toward Fanning as compared to similarly situated individuals who were not disabled and, as such, DST's actions were unlawful employment practices in violation of ADA.

121.   Fanning's disability was a motivating factor in DST's decision to treat him disparately as compared to similarly situated non-disabled employees.

122.   Management level employees knew or should have known of the discrimination based upon his disability but failed to address the problem by failing to reasonably accommodate Fanning's requested accommodation.

123.   At the time these actions were taken by DST, Defendant and its management knew that their actions were unlawful.

124.   The actions and conduct set forth herein were outrageous and showed an evil motive and/or reckless indifference or conscious disregard for the right of Fanning, and therefore Fanning is entitled to punitive damages from DST to punish Defendant and to deter Defendant and others from like conduct.

125.   Fanning has been damaged by DST's unlawful employment actions.

WHEREFORE, Fanning prays for judgment against DST on Count IV of his Complaint, for a finding that he has been subjected to unlawful discrimination prohibited by 42 U.S.C. § 12101, *et seq.;* for an award of compensatory and punitive damages; for his costs

expended; for her reasonable attorneys' fees; and for such other relief as this Court deems just and proper.

**COUNT V**

**PERCEIVED DISABILITY DISCRIMINATION UNDER THE ADAAA
AGAINST DEFENDANT DST SYSTEMS, INC.**

126.    Fanning hereby incorporates and re-alleges all previously alleged Paragraphs as if fully set forth herein.

116.    DST perceived Fanning as being disabled and that perception was a motivating factor in the decision to constructively terminate Fanning.

127.    DST treated Fanning disparately as compared to other similarly situated employees who had not experienced a medical malady but were still unable to fulfill their duties yet allowed to continue unabated in their employment, DST by and through its managers and/or executives engaged in actions prohibited by the ADA.

128.    The conduct and actions of DST as discussed herein was conducted on the basis of perceiving the Fanning to have a disability and refusing to accommodate him, which constituted discrimination based on such disability.

129.    Fanning suffered a tangible job detriment as a result of DST's discriminatory treatment.

130.    Management level employees knew or should have known of the discrimination based on the perceived disability, but failed to address the problem, and further failed to reasonably accommodate Fanning's disability to allow him to return to employment.

131.    The actions and conduct set forth herein were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of Fanning, and therefore Fanning is entitled to punitive damages from DST, to punish DST and to deter Defendant and

others from like conduct.

132. Fanning's disability was a motivating factor in DST's decision to treat him disparately as compared to other similarly situated employees and to refuse to accommodate him which led to him to being constructively discharged and losing his pay, vacation and other acquired benefits for a significant period of time.

133. Fanning has been damaged by DST's unlawful employment actions.

WHEREFORE, Fanning prays for judgment against DST on Count V of her Complaint, for a finding that she has been subjected to unlawful discrimination prohibited by 42 U.S.C. § 12101, *et seq.;* for an award of compensatory and punitive damages; for his costs expended; for her reasonable attorneys' fees; and for such other relief as this Court deems just and proper.

## COUNT VI

## RETALITION UNDER THE ADAAA
## BY DEFENDANT DST SYSTEMS, INC.

134. Fanning hereby incorporates and re-alleges all previously alleged Paragraphs as if fully set forth herein.

135. After Fanning notified DST about his Barrett's esophagus disease and needing an accommodation, DST retaliated against him by setting him up to fail by placing him in a job without training and threatening him to be replaced by a young college graduate. Fanning was also yelled at and placed in a hostile work environment. When Fanning complained about being yelled at and how that affected his depression and anxiety related disorders, DST retaliated against him by not allowing him to be out of his desk without telling his supervisor and by having weekly meetings with his supervisor to check his work, which no other employee had to do.

136. Fanning knew he was being retaliated against for asserting his rights to work despite his

disability. Fanning was engaged in a protected activity under the law of complaining about what he believed to be discrimination.

137.    DST by and through its managers and/or executives engaged in actions prohibited by the ADA.

138.    The conduct and actions of the above-described perpetrators as discussed herein was conducted on the basis of Fanning's objections to what he believed was discriminatory treatment by the DST in refusing to accommodate him.

139.    Fanning suffered a tangible job detriment as a result of DST's retaliatory treatment.

140.    Management level employees knew or should have known of the retaliation based, but failed to address the problem, and further failed to reasonably accommodate Fanning's disability to allow her to return to employment.

141.    The actions and conduct set forth herein were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of Fanning, and therefore Fanning is entitled to punitive damages from DST, to punish DST and to deter Defendant and others from like conduct.

142.    Fanning engaging in a protected activity of complaining of what he believed to be a discriminatory action was a motivating factor in DST's decision to treat him disparately as compared to other similarly situated employees and to refuse to accommodate him which led to being constructively discharge and lose his pay, vacation and other acquired benefits for a significant period of time.

143.    Fanning has been damaged by DST's unlawful employment actions.

WHEREFORE, Fanning prays for judgment against DST on Count VI of his Complaint, for a finding that he has been subjected to unlawful discrimination prohibited by 42 U.S.C. § 12101, *et seq.;* for an award of compensatory and punitive damages; for his costs expended; for her reasonable attorneys' fees; and for such other relief as this Court deems just and proper.

## COUNT VII

## AGE DISCRIMINATION UNDER THE ADEA
## AGAINST DEFENDANT DST SYSTEMS, INC.

144.    Fanning hereby incorporates and re-alleges all previously alleged Paragraphs as if fully set forth herein.

145.    Fanning is over the age of 40, having been born in 1967, and is therefore considered a member of the protected category under the Age Discrimination in Employment Act, 29 USC ' 621 *et seq*.

146.    DST's actions, as noted above, constituted discrimination against the Fanning in violation of the ADEA.

147.    DST's actions, as noted above, were continuous, arbitrary and capricious and were unlawful employment practices in violation of the ADEA.

148.    Based upon the foregoing, Fanning's age was a motivating in DST's decision to discriminate and not accommodate him.

149.    At the time these actions were taken by DST, Defendant knew these actions were unlawful.

150.    DST's actions were outrageous because of their evil motive or reckless indifference to the rights of the Fanning when they engaged in acts of discrimination against Fanning that culminated in his disparate treatment and his constructive termination from employment.

151.    Fanning has been damaged by DST's unlawful employment actions in violation of the ADEA.

WHEREFORE, Fanning prays for judgment against DST on Count VII of his Complaint, for a finding that he has been subjected to unlawful discrimination prohibited by the Age Discrimination in Employment Act, 29 USC ' 621 *et seq.;* for an award of compensatory and punitive damages; for his costs expended; for his reasonable attorneys' fees; and for such other relief as this Court deems just and proper.

## VII. Prayer for Relief

152.    Wherefore, Fanning prays that this Court:

a.   declare the conduct engaged in by DST to be in violation of Fanning's rights;

b.   enjoin DST and its managers/supervisors from engaging in such conduct;

c.   restore Fanning to his rightful position with DST or, in lieu of reinstatement, order front pay and benefits for the period remaining until normal retirement;

d.   award Fanning equitable relief of back salary and fringe benefits up to the date of reinstatement and prejudgment interest for that entire period or front salary and benefits accrual;

e.   award Plaintiff compensatory, punitive and liquidated damages against all DST;

f.   award Fanning damages for emotional pain and suffering;

g.   award Fanning his costs and attorneys' fees; and

h.   grant such other relief as it may deem just and proper.

## DEMAND FOR A JURY TRIAL

Fanning demands trial by jury on all issues triable by a jury in this complaint.

Respectfully submitted,

By: /s/ *Kevin Baldwin*
     Kevin Baldwin, MO Bar No. #49101
     Eric Vernon, MO Bar No. #47007
     Sylvia Hernandez, MO Bar No. #70670
     **BALDWIN & VERNON**
     14 South Main Street
     Liberty, MO 64068
     Tel: (816) 842-1102
     Fax (816) 842-1104
     Kevin@bvalaw.net
     Eric@bvalaw.net
     Sylvia@bvalaw.net
     ATTORNEY FOR PLAINTIFF